IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
ROANOKE DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | Case No. 7:16CR30026 |
| v. | ) | |
| | ) | |
| TERRANCE N. BROWN, JR., | ) | By: Michael F. Urbanski |
| Defendant/Petitioner. | ) | Chief United States District Judge |

## <u>MEMORANDUM OPINION</u>

Terrance Nathaniel Brown, Jr., a federal inmate proceeding <u>pro se</u>, has moved to vacate

his convictions and sentence pursuant to 28 U.S.C. § 2255. The government has filed a

response in opposition to which Brown has replied, making the matter ripe for consideration.

Because the record conclusively shows that Brown is not entitled to relief and he has not

shown good cause for an evidentiary hearing, the motion is **DENIED**.

## I.    Procedural History

Following a multi-week trial in 2017, a jury convicted Brown on Count Two of the

superseding indictment, ECF No. 526, charging conspiracy to distribute and possession with

the intent to distribute heroin, cocaine, cocaine base, and marijuana.   Jury Verdict, ECF No.

893.[1] Prior to trial, Brown had been appointed three CJA counsel, and after expressing

displeasure with his third CJA counsel, Brown represented himself at trial.[2] Following his

conviction, Brown was sentenced to 240 months imprisonment.

---

[1] The jury was unable to reach a verdict on the other count submitted to it, Count One, charging conspiracy to violate
the Racketeer Influenced and Corrupt Organizations Act (RICO) in violation of 18 U.S.C. § 1962(d).

[2] Killis T. Howard was appointed as CJA counsel for Brown on November 9, 2016. ECF No. 83. On January 30, 2017,
Brown moved for new CJA counsel, expressing displeasure with counsel's performance. The court granted Brown's
motion for new counsel the next day, Order, ECF No. 210, and CJA counsel Dana Cormier was appointed on February
1, 2017. ECF No. 213. On March 8, 2017, CJA counsel moved to withdraw, citing a conflict of interest. Mot., ECF No.
231. The court appointed Paul G. Beers as counsel for Brown at a hearing held on March 23, 2017. ECF No. 257. On
July 13, 2017, two months before trial, Brown asked the court to dismiss CJA counsel Paul Beers, stating that

Brown's convictions were affirmed by the United States Court of Appeals for the Fourth Circuit on May 1, 2020. United States v. Brown, 811 F. App'x 818 (4th Cir. 2020). On April 26, 2021, the Supreme Court denied his petition for a writ of certiorari. See Brown v. United States, No. 20-6374 (Apr. 26, 2021).

On January 18, 2022, Brown moved to vacate his convictions and sentence under 28 U.S.C. § 2255.[3] In his motion, Brown asserts eight claims of ineffective assistance of counsel on appeal. See Mot. to Vacate, ECF Nos. 1378, 1378-2. Brown alleges that appellate counsel (Paul G. Beers) provided ineffective assistance by: (1) failing to confer with him regarding the appeal and raise claims of plain error; (2) failing to argue on appeal that in the absence of a special verdict, Brown should have been sentenced to not more than 60 months, the maximum penalty for marijuana; (3) failing to argue on appeal that the district court erred by relying for sentencing purposes on disputed information in the PSR; (4) failing to argue on appeal that the court erred in applying a leadership guidelines enhancement; (5) failing to argue on appeal that the court misapplied an Allen charge; (6) failing to argue on appeal that marijuana has been legalized in Virginia; (7) failing to argue on appeal that the government created the drug conspiracy; and (8) failing to argue on appeal that the Sixth Amendment was violated because the case was tried in Roanoke instead of Norfolk.

The government filed a response in opposition to the § 2255 motion on June 2, 2022, ECF No. 1387, to which Brown filed a reply. ECF No. 1389.

---

"I do not want his assistance any further on my case." Mot., ECF 429, at 2. At a hearing conducted on July 19, 2017, Brown moved to represent himself. ECF No. 494. Paul Beers was appointed as standby counsel. Order, ECF No. 492.

[3] Although the court did not receive the motion until January 28, 2022, Brown declared under penalty of perjury that the motion was placed in the prison mailing system on January 18, 2022. See Houston v. Lack, 487 U.S. 266, 276 (1988) (establishing the prison mailbox rule).

## II.    Summary of Relevant Facts

In affirming the convictions for RICO conspiracy and obstruction of justice on direct

appeal, the Fourth Circuit summarized the facts as follows:

> The Defendants-Appellants are members of the Mad Stone Bloods ("MSBs"), a gang founded in Rikers Island prison that still is centrally run out of New York City. The MSBs have a pyramid hierarchy structure with tiers of leadership within various sets. The head of each set is known as a Godfather. Jones was a Godfather of one New York set, the Mad Stone Henchmen. The New York MSBs oversee sets and members in other states, including Virginia.
>
> While less tightly run as the New York MSBs, the Virginia MSBs have a similar pyramid structure with tiers of leadership within similarly named sets. Brown was an acting Godfather of one Virginia set until the New York MSBs demoted him, and Jennings was also a Godfather of a Virginia set.
>
> In 2012, law enforcement began using Adrienne Williams—a member of a female set of MSB in Virginia—as a confidential informant. She continued in that role, for which she was paid, for four years. Throughout that time, law enforcement had Williams coordinate controlled buys of illegal drugs, and she wore a wire for hundreds of recorded conversations with both New York and Virginia MSB members, including conversations with Jones, Brown, and Jennings.
>
> In 2016, twelve MSB members were named in an indictment, which was later superseded, in the U.S. District Court for the Western District of Virginia, alleging violations of federal Racketeer Influenced and Corrupt Organizations Act ("RICO") and drug laws, as well as related underlying substantive offenses. The Defendants-Appellants exercised their right to a jury trial and were tried together. At the close of the Government's case, Brown moved for a judgment of acquittal on the four underlying substantive counts, arguing the Government failed to prove venue was proper in the Western District of Virginia. The district court agreed and dismissed the four firearms charges without prejudice. As a result, the court charged the jury with deciding only two counts for each of the Defendants-Appellants: conspiracy to violate RICO and drug conspiracy. The jury found

> each one not guilty of the RICO conspiracy and guilty of the drug conspiracy.
>
> Thereafter, the district court conducted individualized sentencing hearings for the Defendants-Appellants. It sentenced Jones to 41 months' imprisonment, Brown to 240 months' imprisonment, and Jennings to 144 months' imprisonment.

Brown, 811 F. App'x at 821–22.

### III.   Standard of Review

Brown has moved to vacate his convictions and sentence under 28 U.S.C. § 2255. Section 2255 sets forth four grounds on which a prisoner in federal custody may collaterally attack a conviction or sentence: (1) "the sentence was imposed in violation of the Constitution or laws of the United States"; (2) "the court was without jurisdiction to impose such sentence"; (3) "the sentence was in excess of the maximum authorized by law"; or (4) the conviction or sentence is "otherwise subject to collateral attack." 28 U.S.C. § 2255(a). The petitioner bears the burden of proof by a preponderance of the evidence. Miller v. United States, 261 F.2d 546, 547 (4th Cir. 1958).

The court may resolve a § 2255 motion without conducting an evidentiary hearing if "the files and records of the case conclusively show that the prisoner is entitled to no relief." 28 U.S.C. § 2255(b). "When the district court denies § 2255 relief without an evidentiary hearing, the nature of the court's ruling is akin to a ruling on a motion for summary judgment." United States v. Poindexter, 492 F.3d 263, 267 (4th Cir. 2007). In such circumstances, the facts must be considered "in the light most favorable to the § 2255 movant." Id. However, "conclusory allegations" or "airy generalities" are insufficient "to stave off summary judgment or entitle a habeas petitioner to an evidentiary hearing." United States v. Roane, 378 F.3d 382,

400–01 (4th Cir. 2004) (internal quotation marks and citation omitted); see also Jones v. Polk, 401 F.3d 257, 269 (4th Cir. 2005) ("[A] federal habeas court is permitted to hold [an evidentiary] hearing only if the petitioner alleges additional facts that, if true, would entitle him to relief.") (internal quotation marks and citation omitted).

Additionally, "a habeas movant, 'unlike the usual civil litigant in federal court, is not entitled to discovery as a matter of course.'" United States v. Echols, 671 F. App'x 64, 65 (4th Cir. 2016) (quoting Bracy v. Gramley, 520 U.S. 899, 904 (1997)). Instead, discovery is permitted only upon a showing of "good cause." Rule 6, Rules Governing Section 2255 Proceedings. To establish good cause for post-conviction discovery, "[a] habeas movant must make specific allegations establishing reason to believe that, if the facts are fully developed, he is entitled to relief." Echols, 671 F. App'x at 65 (citing Roane, 378 F.3d at 403).

## IV.   Analysis of Ineffective Assistance Claims

Brown's claims of ineffective assistance of counsel are reviewed under the framework established by the Supreme Court in Strickland v. Washington, 466 U.S. 668 (1984). To prevail on a claim of ineffective assistance, a defendant must prove two elements. First, he must establish that counsel's representation fell below an objective standard of reasonableness. Id. at 687. This requires demonstrating that counsel's performance was so deficient that he was "not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." Id. Second, the defendant must establish that counsel's deficient performance prejudiced his defense. Id. Specifically, "[t]he defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the results of the proceedings would have been

different." Id. at 694. The defendant must meet both prongs of the Strickland test, and the court may address them in either order. Id. at 697.

> **1.      Claim One - Failure to Confer with Brown About the Appeal and Raise Claims of Plain Error.**

In his first claim of ineffective assistance, Brown asserts that appellate counsel "was ineffective for failing to visit with petitioner one time to go over the petitioner's timely trial objections that the petitioner timely made on meritorious claims during trial, being as though petitioner was pro se during his trial. Mr. Paul Beers also failed to raise claims of plain errors that affect petitioner's Constitutional rights." Mot. to Vacate, ECF No. 1378, at 4. Brown claims that his appellate counsel filed the direct appeal "without communicating with [him] on contents, strategies or issues pursued." Mem. in Supp. of Mot. to Vacate, ECF No. 1378-2, at 10. As a result, Brown asserts that appellate counsel's "nominal," id., representation was constitutionally ineffective. Brown explains that while proceeding pro se at trial, he made many objections which he thought were preserved on appeal. Because appellate counsel declined Brown's numerous attempts to confer with him, Brown contends that counsel was ineffective in not raising these objections on appeal. Id. at 9; Reply Mem., ECF No. 1389, at 4-7.

During the pendency of the appeal, Brown raised with the Fourth Circuit the issue of communication with his counsel by means of a motion to substitute counsel. As he does in Claim One here, Brown told the Fourth Circuit in the motion to substitute counsel that his appointed counsel, Paul Beers, had not allowed him to participate in the preparation of post-trial motions, and that Beers was not responsive to his requests during telephone calls. See ECF No. 103 in Fourth Circuit Case No. 18-4295. The Fourth Circuit ordered Beers to

respond to Brown's motion, and he did so. See ECF No. 104 in Fourth Circuit Case No. 18-4295.

Beers represented to the Fourth Circuit that he had communicated with Brown after the notice of appeal was filed.   He wrote to Brown twelve times and spoke with him on the telephone five times between May 4, 2018, and October 7, 2019. ECF No. 105 in Fourth Circuit Case No. 18-4295. Beers acknowledged that Brown "[did] not like the contents of his communications with counsel." Id. at 2. The Fourth Circuit denied Brown's request for substitution of counsel. See ECF No. 106 in Fourth Circuit Case No. 18-4295. Based on Beer's representations to the Fourth Circuit, the court finds that Brown's assertion that Beers failed to communicate with him is not supported by the record.

Moreover, this is not a case like Roe v. Flores-Ortega, 528 U.S. 470 (2000), which concerned the constitutional obligation of counsel to consult with a defendant about whether to file an appeal. Here, Brown's right to appeal was exercised, and appellate counsel raised several issues regarding Brown's conviction in the Brief of Appellants. United States v. Brown, No. 18-4295, Doc. 61.

Brown's claim that appellate counsel was ineffective by not raising on appeal certain unspecified issues based on Brown's trial objections fails to meet both Strickland prongs. Although Beers may not have raised all the issues Brown believed were meritorious, an indigent defendant does not have a constitutional right to compel appointed counsel to "press nonfrivolous points requested by the client, if counsel, as a matter of professional judgment, decides not to press those points." Jones v. Barnes, 463 U.S. 745, 751 (1983). "Experienced advocates since time beyond memory have emphasized the importance of winnowing out

weaker arguments on appeal and focusing on one central issue if possible, or at most on a few key issues." Id. at 751–52. It is possible to bring a Strickland claim based on an attorney's failure to raise a particular claim, but it is difficult to demonstrate that counsel was incompetent. Smith v. Robbins, 528 U.S. 259, 288 (2000). "Generally, only when ignored issues are clearly stronger than those presented, will the presumption of effective assistance of counsel be overcome." Gray v. Greer, 800 F.2d 644, 646 (7th Cir. 1986) cited with approval in Smith, 528 U.S. at 288. See also Shrader v. United States, No. 1:13-33098, 2015 WL 13745348, at *7 (S.D.W.Va. July 24, 2015) ("[I]n order to prove ineffective assistance of appellate counsel, a movant must show that his appellate counsel failed to raise a strong meritorious issue on appeal.").

Brown does not identify any specific objection or issue on appeal that appellate counsel failed to raise. Rather, Claim One is entirely conclusory. While Brown mentions in Claim One "numerous objections based on meritorious claims," Mem. in Supp. of Mot. to Vacate, ECF No. 1378, at 14, none are identified. By not specifying any of the "numerous objections" which he asserts appellate counsel failed to raise on appeal, Brown is unable to demonstrate that appellate counsel's performance fell below an objective standard of reasonableness. Second, because Brown does not indicate which of the "numerous objections" appellate counsel failed to raise, the court cannot find that Brown is able to show that there is a reasonable probability that the result of the appeal could have been different had Beers raised these unspecified "numerous objections."[4]

---

[4] It is worth noting that appellate counsel was standby counsel for Brown at trial and had access to the electronically docketed trial transcript for many months before the Brief of Appellants was docketed with the Fourth Circuit. As such, appellate counsel was fully able to evaluate the trial evidence and raise appropriate issues on appeal.

### 2. Claim Two – Failure to Argue on Appeal that Brown's Sentence Should Have Been Subject to the 60 Month Statutory Maximum Sentence for Marijuana.

In Claim Two, Brown contends that appellate counsel was ineffective for failing to argue on appeal that the court's instructions and verdict form on the drug conspiracy count did not "distinguish what specific substance(s) the petitioner was convicted of transporting or the weight that petitioner Brown should have been legally responsible for." Mot. to Vacate, ECF No. 1378, at 7. Brown argues that the use of a general verdict form violated the law as stated in Apprendi v. New Jersey, 530 U.S. 466 (2000), because the jury was not asked to find Brown "legally responsible for a specific substance and quantity in the conspiracy." Mem. in Supp. of Mot. to Vacate, ECF No. 1378-2, at 17.

The superseding indictment charged a multi-drug conspiracy involving heroin, cocaine base, cocaine, and marijuana. Superseding Indictment, ECF No. 526, at 18. The jury was instructed as follows:

> Count Two of the Indictment charges that from beginning on a date unknown, but starting no later than 2010 and continuing to in or about December 2016, in the Western District of Virginia and elsewhere Michael Jones, Michael Demont Dove, Terrance Nathaniel Brown, Jr., Clifford Jennings, and others knowingly conspired with one another to distribute, and to possess with the intent to distribute, (a) a mixture or substance containing a detectable amount of heroin; (b) a mixture or substance containing a detectable amount of cocaine base (crack); (c) a mixture or substance containing a detectable amount of cocaine; and (d) marijuana.

> Count Two also alleges that it was part of the drug conspiracy that Jennings conspired with others to distribute, and to possess with the intent to distribute, one kilogram or more of a mixture or substance containing a detectable amount of heroin.

Jury Instructions, ECF No. 880, at 48. Consistent with the jury instructions, the verdict form applicable to Brown on Count Two did not differentiate between drug type or quantity as the jury was instructed that Brown was charged in a conspiracy to distribute a detectable amount of all four substances. The verdict form provided:

## COUNT TWO
(Conspiracy to Distribute and Possession with Intent to Distribute Heroin, Cocaine, Cocaine Base, and Marijuana)

As to Count Two, we unanimously find defendant TERRANCE NATHANIEL BROWN, Jr.:

Not Guilty _____

Guilty     ✓_____

Brown Verdict Form, ECF No. 893, at 2. The verdict form as to codefendant Clifford Jennings differed from Brown's as he was charged with the enhanced crime of distributing more than a kilogram of heroin. As to Jennings, the verdict form also asked whether he conspired to possess with intent to distribute one kilogram of cocaine, which bore a maximum sentence of life imprisonment under 21 U.S.C. § 841(b)(1)(A).

Brown argues that the jury should have been asked on the verdict form which of the drugs he conspired to distribute, because had the jury concluded that he was responsible for marijuana only, his maximum penalty would have been only five years, under 21 U.S.C. § 841(b)(1)(D).

Brown's argument fails because neither the jury instructions nor verdict form were ambiguous as to what the jury was required to find—that the conspiracy involved all four drugs. Both the jury instructions and the verdict form used the conjunctive "and" in connection with

the drugs charged as involved in the conspiracy. As such, there is no basis for Brown to argue that he could be sentenced only for the marijuana part of the conspiracy, which the jury found also to include heroin, cocaine, and crack cocaine.

This is not a case like United States v. Rhynes, 196 F.3d 207, 237 (4th Cir. 1999), where "the district court told the jury that it could find a defendant guilty on the conspiracy count if it found that the defendant had conspired to 'distribute or possess with the intent to distribute heroin, or cocaine, or cocaine base or marijuana."  Where the jury was so instructed, the Rhynes court concluded that "the conviction may have been based on a conspiracy to distribute either heroin, cocaine, cocaine base, or marijuana (or any combination of those substances). Thus, no defendant could be sentenced for more than the statutory maximum for the least-serious, single-drug conspiracy of which he may have been convicted." Id. at 239. Here, however, the jury instructions and verdict form do not contain the ambiguity found in Rhynes from the use of the disjunctive "or."  Rather, the jury was clearly instructed that the conspiracy involved distribution of all four substances. In United States v. Cotton, 261 F.3d 397, 402 (4th Cir. 2001), the Fourth Circuit found no Rhynes error where the jury was unambiguously instructed that defendants conspired to distribute or possess with intent to distribute powder cocaine and cocaine base. See also United States v. Daniels, 39 F. App'x 834, 837-38 (4th Cir. 2002) ("The Court instructed the jury in unambiguous terms that a conspiracy conviction could be based only upon a finding that there was a conspiracy to distribute both powder and crack cocaine, and the evidence was sufficient to support a finding that Daniels conspired to distribute both. There is no reason to believe that the jury failed to follow the instructions it was given. The jury's verdict of guilty thus clearly evidences a

conclusion beyond a reasonable doubt that both powder cocaine and crack cocaine were objects of the conspiracy.").

Moreover, the evidence was sufficient to convict Brown of a conspiracy involving all four drugs. Many witnesses testified to Brown's acts in furtherance of the conspiracy involving distribution of cocaine and heroin.

Former Mad Stone Bloods gang member Anthony Day testified that gang members Eminem and Lady Messiah directly supplied drugs into Virginia from New York. Trial Tr., ECF No. 1126, at 221. As to Brown, Day testified that Eminem provided cocaine and heroin to Brown which he sold. Id. at 222. Day testified:

> Q.    Mr. Brown, where was Mr. Brown, if you know, getting the drugs he was moving?
>
> A.    Eminem.
>
> Q.    Do you know what type of drugs Mr. Brown sold?
>
> A.    Cocaine and heroin.

Id.

Former Mad Stone Bloods member Aaron Gerald testified that he was approached to switch gangs from the Nine Trey Gangsta Bloods to the Mad Stone Bloods while incarcerated at the Greensville Correctional Facility in Virginia in 2011. Trial Tr., ECF No. 819, at 7-8, 13. Gerald testified that he sold heroin, cocaine, marijuana, and tobacco at Greensville, id. at 28, and that Brown, who reported to him in the gang hierarchy, was involved in narcotics distribution there. Id. at 30-31, 37, 41. Gerald testified:

> Q.    Did you have other individuals who were selling it for you?

A.    Yes.

Q.    How many individuals did you have selling for you?

A.    Just people that was within our set.

Q.    What do you mean, within your set?

A.    Within the Mad Stone Bloods set.

\*            \*            \*            \*            \*

Q.    Who were the Mad Stone members that were involved in these drug transactions?

A.    Oh, multiple. Multiple.

Q.    What are some names?

A.    Diego Brown, which is Supreme. Mr. Brown right here. Mr. Powell. I can't remember other names.

Id. at 35, 41.

Cornelius Gaymon testified that he switched from the Nine Trey Gangstas to the Mad

Stone Bloods gang around 2010 while incarcerated at the Greenville Correctional Center. Trial

Tr., ECF No. 1132, at 49. Gaymon testified:

Q.    Did you deal drugs in Greensville with other members of MSB?

A.    Yes, ma'am.

Q.    Who?

A.    Big A, Supreme, War,[5] Boogie, Anthony Day.

Q.    What types of drugs were you dealing in Greensville?

---

[5] Gaymon identified Brown as having the Mad Stone Bloods gang name "War." Trial Tr., ECF No. 1132, at 157–58.

> A.       Marijuana, tobacco, and heroin.

Id. at 80. After he got out of prison, Gaymon testified that around 2014 Brown was selling heroin on the street. Gaymon testified:

> Q.       Sir, were you aware that Mr. Brown, War, was involved in dealing narcotics around this time?
>
> A.       Yes, ma'am.
>
> Q.       How were you aware of that?
>
> A.       I was texted by War that he had 8-balls of heroin.

Id. at 118. Gaymon also testified that he learned from another gang member "[t]hat War had messed up a supply of heroin coming from the higher council in New York, and that Mr. Cliff Jennings had took over the supply, and he was running the heroin, running it from the members in New York." Id. at 116.

Nicholas Johnson testified that he was a member of the Mad Stone Bloods from 2010 to 2013, starting at the Greensville state prison. Trial Tr., ECF No. 1133, at 14, 23.   Johnson testified that Brown's gang name was War, and that Brown held the rank of five star general. Id. at 27–28. Johnson testified that the Mad Stone Bloods were involved in robberies and drug dealing, and operated both in Virginia prisons and on the streets. Id. at 32.   Johnson testified that Brown told him that he was involved in drug trafficking both on the streets and in the Sussex and Lawrenceville state prisons, and sold weed and cocaine in the prisons by getting "people to bring stuff in through visitation." Id. at 43–44.

Adrienne Williams testified that she was a GM, or Godmother, of the Mad Stone Bloods. Trial Tr., ECF No. 1129, at 32. Williams identified Brown and testified that he went by the gang name War. Id. at 52–53. Williams stated that Brown was a GF, or Godfather, of

the Mad Stone Bloods. Id. at 52, 167, 169. Williams testified that a Godfather was the "top of the hood," which was a subset of the Mad Stone Bloods. Id. at 47–48. On a recording played for the jury, Brown told Williams that he was the one who talked to the bigger gang members in New York and that had seventeen people underneath him. Id. at 172. Williams testified that she sold both heroin and cocaine for the gang, id. at 59, and that she discussed with Brown bringing controlled substances into jails. Id. at 63. Brown told her that "[h]e'd have somebody else – he would meet up with someone else to get it into the jail." Id. Williams testified that she got the heroin she sold from Gerald, id., and that Brown provided her with cocaine that she sold, which she did twice. Trial Tr., ECF No. 1130, at 153, 155–56.

Shawn Smith testified that he became a Mad Stone Bloods member in 2002 in New York. Trial Tr., ECF No. 1127, at 279. Smith identified Brown in court and testified that his gang name was War. Id. at 291. Smith first met Brown in 2014, and was told by Eminem that Brown "put work in and he had the streets down south in Virginia at that time." Id. at 291–92. Smith testified that Brown told him that he "do a little hustling, about 7 grams of heroin." Id. at 298.

Given this evidence, the court is confident that the jury was convinced beyond a reasonable doubt that Brown was convicted of a "*single multi-drug* conspiracy," Cotton, 261 F. 3d at 403, involving heroin, cocaine, and marijuana. See United States v. Bowens, 224 F. 3d 302, 314–15 (4th Cir. 2000); United States v. Mackins, 315 F.3d 400, 415–16 (4th Cir. 2003).

Finally, the claim in this case is ineffective assistance of counsel for not raising the use of the general verdict form on appeal. As the court noted in Davis v. United States, No. 97-CR-00040-A, 2001 WL 34872571, at *3 (W.D. Va. May 31, 2001),

Thus, even if counsel had raised the special verdict issue on appeal, arguing that Davis should have been sentenced for diazepam as the drug carrying the lowest statutory penalty, the court finds no reasonable likelihood that the court of appeals would have granted relief on that issue. As in <u>Bowens</u>, the court of appeals would likely have found the failure to require a special verdict to be plain error, but would also have found the evidence to be overwhelming that Davis participated in a conspiracy to traffic primarily in marihuana, rather than in diazepam. 224 F. 3d at 315. Thus, the court would likely not have found that the error 'seriously affected the fairness, integrity or public reputation of judicial proceedings,' <u>id.</u>, quoting <u>United States v. Olano</u>, 507 U.S. 725, 736 (1993), and so would have refused to notice the error or grant relief.

The same reasoning applies to deny Claim Two in this case.

### 3.  Claim Three – Failure to Argue on Appeal that the Court Violated Brown's Due Process Rights When it Relied on Disputed Information at Sentencing.

In Claim Three, Brown asserts that his appellate counsel was ineffective for not arguing on appeal that the court erred in considering the amount of marijuana that codefendant Corey Owens sold. This claim fails because the drug weight issue was raised on appeal by Brown's appellate counsel, Br. of Appellants, No. 18-4295 (L), Doc. 61, at 34–47, and was addressed by the Fourth Circuit in its opinion. <u>United States v. Brown</u>, 811 F. App'x 818, 826–30 (4th Cir. 2020).

### 4.  Claim Four – Failure to Argue on Appeal that the Court Erred in Applying a Three Point Advisory Sentencing Guidelines Enhancement for Brown's Leadership Role.

In his fourth claim, Brown asserts that appellate counsel was deficient by failing to raise on appeal the three-point enhancement for a leadership role in the drug conspiracy, basing this argument on the fact that the jury did not reach a verdict on the RICO conspiracy. Brown's argument ignores the fact that the jury found him guilty of a drug dealing conspiracy as to

which the three-point manager or supervisor enhancement plainly applies given the abundant evidence that Brown was a ranking member of the Mad Stone Bloods in Virginia involved in drug dealing. The evidence was plainly sufficient to establish that Brown "was a manager or supervisor (but not an organizer or leader) and that the criminal activity involved five or more participants." U.S.S.G. §3B1.1(b). Nicholas Johnson testified that Brown had the gang rank of five star general, Trial Tr., ECF No. 1133, at 27–28, Adrienne Williams testified that Brown was a Mad Stones Blood Godfather, Trial Tr., ECF No. 1129 at 52–53, and Smith testified that Brown "had the streets down south in Virginia at that time." Trial Tr., ECF No. 1127, at 291–92. As noted above, many witnesses testified as to Brown's drug dealing activities, both on the streets and inside Virginia's prisons.

Moreover, this claim would have been unlikely to succeed on appeal as the court made it clear at sentencing that "[r]egardless of where I come down on the guidelines in this case, I know what the sentence needs to be in this case under the 3553(a) factors." Sentencing Tr., ECF No. 1242, at 66. The court explained:

> I've never seen the level of violence, the level of danger, the level of callous disregard for human life that I have seen in the drug conspiracy in this case. I've heard people brag about shooting somebody and then laughing about it. The violence associated with the drug dealing in this case is hard. It is the worst thing in our society, the callous disregard for human life.

Id. at 84. After reviewing the factors under 18 U.S.C. § 3553(a), the court concluded:

> Therefore, I am going to sentence Mr. Brown to the maximum sentence that I can sentence him under the law. I'm varying upwards from the guidelines to 240 months. I believe this sentence to be sufficient, but not greater than necessary.

17

> Like I said, I have not seen in any case I've been associated with the level of violence associated with the drug dealing in this case, directly attributable to Mr. Brown. So I'm sentencing him to 240 months in the Bureau of Prisons.
>
> And I understand it's more than I've given other folks in this case, but I have not seen the level of violence. I gave Mr. Nicholas and Mr. Jennings less time, but they did not have the violence associated with them and the callous disregard for human life associated with the drug dealing activities in this case. So I'm varying upwards by five months, to 240 months, in this case. That is the statutory maximum penalty I can give.
>
> And I said this earlier.  Regardless of the guidelines finding I made in this case, I would give the same sentence, because this is the most dangerous conduct involved with drug dealing that I have seen in my years as a United States District Judge. And if any case demands the maximum 240-month sentence, this case cries out for it. And, in fact, if I could give . . . Mr. Brown more time, I would, but I can't.

Id. at 87–88.

On direct appeal, the Fourth Circuit considered Brown's objection that the court erred in its calculation of the advisory sentencing guidelines as to the drug weight and found the sentence imposed to be reasonable, noting that "[t]he complete sentencing transcript reveals unambiguously that the district court sentenced Brown based on its consideration of the § 3553(a) factors and that the Guidelines calculation played no role in the sentence that the court ultimately imposed apart from being a necessary starting point." 811 F. App'x at 829.

Accordingly, the court cannot conclude that appellate counsel engaged in any constitutional error by not appealing the court's sentencing guidelines determination of a role enhancement or that this argument could have been successful on appeal.

### 5.    Claim Five – Failure to Argue on Appeal that the Court Erred in Giving an <u>Allen</u> Charge.

18

In Claim Five, Brown asserts that the court coerced a verdict by giving an instruction under Allen v. United States, 164 U.S. 492 (1896). The Fourth Circuit summarized the legal issues surrounding the giving of an Allen charge in United States v. Burgos, 55 F.3d 933, 936 (4th Cir. 1995).

> An Allen charge, based on the Supreme Court's decision in Allen v. United States, 164 U.S. 492 (1896), is "[a]n instruction advising deadlocked jurors to have deference to each other's views, that they should listen, with a disposition to be convinced, to each other's argument." United States v. Seeright, 978 F.2d 842, 845 n. * (4th Cir.1992) (quoting BLACK'S LAW DICTIONARY 74 (6th ed. 1990)). Traditionally, the standard Allen charge informed the jury (1) that a new trial would be expensive for both sides; (2) that there is no reason to believe that another jury would do a better job; (3) that it is important that a unanimous verdict be reached; and (4) that jurors in the minority should consider whether the majority's position is correct. United States v. Russell, 971 F.2d 1098, 1107 n. 18 (4th Cir. 1992).

> At the heart of our Allen charge jurisprudence is the basic principle that a defendant has "the right to have the jury speak without being coerced." United States v. Sawyers, 423 F.2d 1335, 1341 (4th Cir. 1970). This court has upheld Allen charges as long as the instructions contained therein were "fair, neutral, and balanced." Carter v. Burch, 34 F.3d 257, 264 (4th Cir. 1994); cf. Sawyers, 423 F.2d at 1339 (holding that the supplemental charges "were not so coercive as to impair the integrity of the verdicts").

On the eighteenth day of trial, October 5, 2017, following instructions and closing argument, the jury began deliberating at 10:55 a.m., and concluded for the evening at 5:14 p.m. The jury deliberated all day on October 6, 2017. After a weekend's recess, the jury reconvened on October 9, 2017, and began deliberating at 9:07 a.m. At 10:39 a.m., the jury provided the court with the following note:

_We have come to unanimous verdict on several charges, but on others we are in gridlock. It no longer appears that additional time will resolve the disagreements._

Jury Note, ECF No. 886.

After conferring with counsel and noting their objections, the court read the following modified <u>Allen</u> charge[6] to the jury:

> As stated in my instructions, it is your duty to consult with one another and to deliberate with a view to reaching agreement if you can do so without violence to your individual judgment. You must not surrender your honest convictions as to the weight or effect of the evidence solely because of the opinions of other jurors or for the mere purpose of returning a verdict. Each of you must decide the case for yourself; but you should do so only after consideration of the evidence with your fellow jurors.
>
> Remember that you are the judges of the facts. Your sole interest is to seek the truth from the evidence. You are the judges of the credibility of the witnesses and the weight of the evidence.
>
> In the course of your deliberations you should not hesitate to re-examine your own views, and to change your opinion if you are convinced it is wrong. To reach an unanimous result you must examine the questions submitted to you openly and frankly, with proper regard for the opinions of others and with a willingness to re-examine your own views.

---

[6] "The traditional, 'pure' <u>Allen</u> charge . . . was an instruction to a deadlocked jury that addressed only jurors in the minority, asking them to consider whether the jurors in the majority were correct. To be less coercive with respect to jurors in the minority, we have 'strongly recommended' that any <u>Allen</u> charge address all jurors, both in the minority and in the majority, "to give equal consideration to each other's views." <u>Burgos</u>, 55 F.3d at 937 (quoting <u>United States v. West</u>, 877 F.2d 281, 291 (4th Cir.1989))." <u>United States v. Hylton</u>, 349 F.3d 781, 788 (4th Cir. 2003).

Let me remind both the jurors in the majority and those in the minority that they reconsider their positions in light of the other side's views.

If you find yourself in the majority, then you should listen and give equal consideration to the views of the minority. If you find yourself in the minority, you should listen and give equal consideration to the views of the majority.

The jury's verdict must represent the final judgment of each juror and not a matter of acquiescence in the majority view of which he or she remains conscientiously unconvinced. But remember also that after full deliberation and consideration of all of the evidence, it is your duty to agree upon a verdict if you can do so without violating your individual judgment and your conscience.

I am going to ask you to go back to the jury room and deliberate further with these thoughts in mind to see whether you can, in good conscience, reach an unanimous verdict.

ECF No. 887. The charge was read at 11:02 a.m., and the jury returned to deliberating at 11:15 a.m. Some three hours later, at 2:33 p.m., the jury returned its verdicts.

The modified Allen charge given to the jury was balanced, instructing both jurors in the majority and in the minority to listen and give equal consideration to each other's views. As such, the modified Allen charge strove to "preserve[ ] all jurors' independent judgment . . . in a balanced manner."   United States v. Hylton, 349 F.3d 781, 788 (4th Cir. 2003). Nothing about the charge given was coercive or suggested that the jury surrender their conscientious convictions. In fact, the instruction told the jury to do just the opposite—that they "must not surrender your honest convictions as to the weight or effect of the evidence solely because of the opinions of other jurors or for the mere purpose of returning a verdict." Id. Because the

modified <u>Allen</u> charge was appropriate, appellate counsel was not ineffective for failing to raise this issue on appeal.

### 6. Claim Six – Failure to Advise the Court of Appeals That Virginia Has Legalized Marijuana.

As Brown was convicted of conspiracy to distribute and possess with the intent to distribute controlled substances under federal law, 21 U.S.C. § 846, and not the laws of the Commonwealth of Virginia, recent changes to Virginia law concerning marijuana possession are irrelevant. Marijuana remains a controlled substance under federal law, 21 U.S.C. §§ 802, 812(c)(c)(10).

Appellate counsel was not ineffective for raising this issue.

### 7. Claim Seven – Failure to Argue on Appeal that the Government Sponsored the Conspiracy Charged.

In Claim Seven, Brown asserts that appellate counsel was ineffective for failing to appeal on the grounds that the government was responsible for the conspiracy charged because of the undercover conduct of Adrienne Williams. Brown argues that Williams worked as a confidential informant for the government since before he was released from state prison in 2013, and that all of her conduct was as a paid federal agent. Among other things, Brown argues that Williams "was the mastermind who orchestrated and planned the 'tattoo parlor' robbery," Mem. in Supp. of Mot. to Vacate, ECF No. 1378–2, at 29; discussed criminal activity with Brown on recordings played for the jury, <u>id.</u> at 30; and directed the "beat-ins" of female gang recruits, <u>id.</u> at 32. Brown argues that "[t]he government used Ms. Williams' testimony and unclean hands as evidence to convict petitioner Mr. Brown for conspiring with their federal informant who was tainted by her own crimes in the conspiracy." <u>Id.</u> at 30.

22

Brown is critical of the court for failing to "properly instruct the jury that a defendant cannot conspire with a government agent." Id. at 34. Brown is wrong, as the court instructed the jury twice on this issue. As part of its "CONSPIRACY – EXPLAINED" instruction, the court instructed the jury as follows:

> Moreover, a defendant cannot conspire with a government agent. One who acts as a government agent and enters into a purported conspiracy in the secret role of an informer or confidential informant cannot be a co-conspirator.

Jury Instructions, ECF No. 880, at 28. Later, as part of its "COUNT TWO: DRUG CONSPIRACY – LAW OF CONSPIRACY" instruction, the court reiterated:

> As I have noted, a defendant cannot conspire with a government agent. One who acts as a government agent and enters into a purported conspiracy in the secret role of an informer or confidential informant cannot be a co-conspirator.

Id. at 50.

Given the fact that the jury was plainly instructed that Brown could not conspire with Williams, acting as a confidential informant, there is no basis for Brown's claim that his appellate counsel was ineffective for failing to argue on appeal that he should be exonerated because Williams worked in an undercover capacity for the government. Plainly, there was sufficient evidence to support the jury's finding that Brown was guilty of conspiring to distribute, and to possess with the intent to distribute, heroin, cocaine, and marijuana separate and apart from Brown's interactions with Williams. As noted above, the jury heard evidence from Anthony Day, Aaron Gerald, Cornelius Gaymon, Nicholas Johnson, and Shawn Smith of Brown's drug dealing activity not involving Adrienne Williams, and this evidence was sufficient to support the jury's conspiracy verdict.

**8.      Claim Eight – Failure to Argue on Appeal that Case Should Have Been Tried in Norfolk, in the Eastern District of Virginia.**

In Claim Eight, Brown asserts that appellate counsel was ineffective for failing to argue on appeal that the Sixth Amendment was violated because this case was tried in the Western, as opposed to the Eastern District of Virginia.  Brown argues that he "resides in Norfolk, Virginia, where all crimes within the Drug Conspiracy of 21 U.S.C. § 846 was committed, and all evidence secured and gathered against Mr Brown would have effect on the community of Norfolk, Virginia, having no effect or connection to Roanoke, Virginia, none of the jurors that resided in Mr. Brown's trial was his peers." Mem. in Supp. of Mot. to Vacate, ECF No. 1378-2, at 35. Brown claims that his trial in the Western District of Virginia violated both the Sixth Amendment and Rule 18 of the Federal Rules of Criminal Procedure.

The Sixth Amendment to the United States Constitution provides, in pertinent part, that "[i]n all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury of the State and district wherein the crime shall have been committed, which district shall have been previously ascertained by law, . . ." U.S. CONST. amend VI. Rule 18 of the Federal Rules of Criminal Procedure provides that "[u]nless a statute or these rules permit otherwise, the government must prosecute an offense in a district where the offense was committed." Fed. R. Crim. P. 18. The venue statute generally applicable to criminal cases provides that "[e]xcept as otherwise expressly provided by enactment of Congress, any offense against the United States begun in one district and completed in another, or committed in more than one district, may be inquired of and prosecuted in any district in which such offense was begun, continued, or completed." 18 U.S.C. § 3237(a). "Where venue requirements are met, the prosecution may proceed in that district,

notwithstanding the possibility that the gravamen of the wrongdoing took place elsewhere."

United States v. Smith, 452 F.3d 323, 334 (4th Cir. 2006).

The court addressed the issue of the venue of this case in three memorandum opinions. Mem. Op., ECF Nos. 395, 682, and 929. On June 20, 2017, the court denied the defendant's motion to dismiss, or in the alternative transfer, Counts Three through Eight of the indictment, charging violent crimes in aid of racketeering under 18 U.S.C. § 1959(a)(3) ("VICAR counts"), and use of a firearm during a crime of violence in violation of 18 U.S.C. § 924(c). Focusing on the allegations of the indictment and the bill of particulars, the court denied the motion to dismiss, reasoning as follows:

> At this procedural stage, the government has alleged sufficient facts to satisfy the venue requirements for Counts Three through Eight of the indictment. The government alleges that the top leader of MSB in Virginia, who is known as the Chairman, as well as other high-ranking gang leaders, resided in prisons in the Western District of Virginia at the time Dove and Brown committed the violent crimes in Norfolk. ECF No. 275, at 6. Those leaders controlled MSB activities on both the street and in the prison systems, according to the government. Id. In fact, the indictment alleges that the "Chairman is the senior decision maker for all MSB matters in Virginia, including gang-related acts of violence, . . . leadership positions/promotions, recruitment, organization and other gang-related activity." ECF No. 19, at ¶ 2(c). The government further alleges that Nicholas Johnson, "the official MSB bookkeeper/record keeper," resided in the Western District when Dove and Brown assaulted O.J. and robbed the tattoo parlor. ECF No. 275, at 6. Johnson's responsibilities included "maintaining the official roster of MSB membership in Virginia." Id. And most importantly, the government alleges that Dove and Brown committed the violent acts alleged in Counts Three through Eight for the purpose of furthering their positions in the gang. ECF No. 19, at ¶¶ 25, 32.

Mem. Op., ECF No. 395, at 12–13.

At the final pretrial conference on September 1, 2017, the five defendants in the trial set to begin on September 11, 2017, agreed and orally moved to transfer the case to the Eastern District of Virginia under Federal Rule of Criminal Procedure 21. The court denied the eleventh-hour transfer request, concluding as follows:

> Although the court has been mindful of venue concerns throughout this case and notes that many of the alleged events took place in the Eastern District of Virginia, it would be both inconvenient and contrary to the interests of justice to transfer this case on the cusp of trial, given the looming trial date, the fact that venue is legally proper here, and the substantial pretrial development that has taken place in this district.

Mem. Op., ECF No. 682, at 1.

The case proceeded to trial. At the close of the government's evidence at trial, defendants Michael Dove and Brown moved for judgment of acquittal of the VICAR and firearms counts (Counts Three through Eight) on the basis of improper venue, and the court granted the motion and dismissed the VICAR counts without prejudice. As detailed in the court's eighteen-page memorandum opinion, after considering all of the venue-related evidence presented by the government at trial, the court concluded that "a review of the government's evidence dictates that the government has failed to establish that venue properly lies in the Western District of Virginia for Counts Three through Eight." Mem. Op., ECF No. 929, at 3.

At the same time, however, the court denied Brown's motion for judgment of acquittal on venue grounds for the RICO conspiracy charged in Count One and the drug conspiracy charged in Count Two, stating:

> In his motion for judgment of acquittal, Brown also moves for a judgment of acquittal for venue on Counts One and Two.

> Racketeering offenses under 18 U.S.C. § 1962 and drug conspiracy offenses under 21 U.S.C. § 846 are continuing offenses. See United States v. Umana, No. 3:08CR134-RJC, 2009 WL 1443395, at *5 (W.D.N.C. May 20, 2009), aff'd 750 F.3d 320 (4th Cir. 2014). As such, "an overt act within the district is sufficient for venue." United States v. Goldman, 50 F.2d 1221, 1226 (4th Cir. 1984); see United States v. Giovanelli, 747 F. Supp. 875, 884 (S.D.N.Y. 1985) (finding that with RICO charges "venue may be properly laid in the district in which the conspiratorial agreement was formed or in any district in which an overt act in furtherance of the conspiracy was committed by any of the conspirators" (emphasis added). The government introduced sufficient evidence of acts in the Western District of Virginia in furtherance of the alleged RICO and drug conspiracies to send those counts to the jury. Accordingly, Brown's motion for acquittal concerning venue as to Counts One and Two is **DENIED**.

Mem. Op., ECF No. 929, n.1.

For the two conspiracy counts that went to the jury, venue was proper in the Western District of Virginia. "In a conspiracy case, the Supreme Court has long held that venue is proper in any district in which any conspirator performs an overt act in furtherance of the conspiracy or performs acts that effectuate the object of the conspiracy, even though there is no evidence the particular defendant ever entered that district or that the conspiracy was formed there." United States v. Bolden, 305 F. App'x 83, 84 (4th Cir. 2008), (citing Whitfield v. United States, 543 U.S. 209, 218 (2005), and Hyde v. United States, 225 U.S. 347, 356-67 (1912)). "[I]n a conspiracy charge, venue is proper for all defendants wherever the agreement was made or wherever any overt act in furtherance of the conspiracy transpires." United States v. Bowens, 224 F.3d 302, 311 n.4 (4th Cir. 2000).

Anthony Day, known by his Mad Stone Bloods name Rokko, testified at trial that Hasin Hubbert, gang name EZ or Rock Rolla, and Larry Boone, gang name Boogie, formed the Mad

Stone Bloods while they were in solitary confinement at the Greensville Correctional Center in 2010.[7] Trial Tr., ECF No. 1126, at 22–25. While the Greensville Correctional Center is located in the Eastern District of Virginia, Hubbert was later transferred to Buckingham Correctional Center and later to Red Onion State Prison, each of which are located in the Western District of Virginia. Boone was transferred to Keen Mountain Correctional Center, also located in the Western District of Virginia. Id. at 163. Day, a Mad Stone Bloods Godfather, testified that the main purpose of the gang was to make money, done by selling drugs, robbery, and extortion. Id. at 28. Day testified that Boone communicated with gang leadership in New York from prisons in the Western District of Virginia. See, e.g., id., at 134. Day also testified that he communicated with Boone about a Mad Stone Bloods robbery in Virginia Beach involving gang members Day, Brown, and Corey Owens. Id. at 214–16.   Day testified that James Bumbry, known by his gang name J Black, a Mad Stone Bloods Godfather, was based in Roanoke, Virginia, and sold drugs for the Mad Stone Bloods. Id. at 62. Another gang member, Carlos Wood, gang name Los, also operated in Roanoke. Id. at 106.

Rontae Gunn testified that he met Hasin Hubbert at the Roanoke City Jail, and Hubbert recruited Gunn to join the hood he had been given the green light to start, the Mad Stone Bloods. Trial Tr., ECF No. 1128, at 107. Several months later, Gunn reconnected with Hubbert at Buckingham Correctional Center, and at that time agreed to become a co-GF (co-Godfather) third in command, of the Mad Stone Bloods, reporting to Hubbert and Boone. Id. at 111–12. Gunn testified as to the Mad Stone Bloods gang structure and rules, stating that

---

[7] Day testified that a gang member known as Triple O also was involved with forming the Mad Stone Bloods. Trial Tr., ECF No. 1126, at 22.

"Papa Don ran the entire hood in New York. So he gave the green light for it to be, you know, up and operating in Virginia." Id. at 112. Gunn testified as to Mad Stone Blood drug dealing in Buckingham Correctional Center in the Western District of Virginia, including detailed testimony regarding the "Green Dot" system employed to transfer drug proceeds to Boone, Hubbert, and Gunn. Id. at 125–36.  Gunn testified that he communicated with other Mad Stone Blood members at other prisons in the Western District of Virginia "specifically relating to MSB members distributing drugs." Id. at 136–37. Gunn expanded on Day's testimony about gang member J Black, who was heavily involved in the cocaine trade in Roanoke, and that he sent money from the street to Gunn and Hubbert in prisons in the Western District. Id. at 137–43. Gunn also testified that he distributed quite a bit of heroin inside the Buckingham Correctional Center over a couple of years on behalf of the Mad Stone Bloods, and described how the money made off the drug sales got distributed to higher gang members like Hubbert. Id. at 143–45. Gunn testified that at the end of 2012, he got into a dispute with Hubbert over money and confronted Hubbert. As a result, Gunn was beaten by seven or eight gang members. Id. at 145–48.

Adrienne Williams testified that Boone gave her the gang name, Scarlett, in 2012. Trial Tr., ECF No. 1129, at 39. William's role in the gang initially was to facilitate communication with gang members in prison. Id. at 39–41. When she joined the gang, Hubbert was the top ranking Mad Stone Bloods gang member in Virginia. Id. at 42. Williams testified that she communicated with Hubbert, Boone, and Brown about bringing drugs into state prisons. Id. at 59–63. Hubbert asked Williams to bring heroin into prison, an order which Boone told her not to follow. Id. at 59–61; Trial Tr., ECF No. 1131, at 165. Boone asked her to bring

marijuana into the prison, but her car broke down. Trial Tr., ECF No. 1129, at 62; ECF No. 1131, at 73, 167.

Nicholas Johnson, known by his gang name Auto, was brought into the gang by Hubbert while the two of them were at Greensville Correctional Center. Trial Tr., ECF No. 1133, at 23–24. Johnson distributed gang literature to gang members, collected dues, and assisted with gang communication. Id. at 34–35, 40. Later he was in charge of the MSBN Manifesto, a notebook logging gang members. Id. at 41. Johnson testified that the gang operated in various zones in Virginia, and that J Black was one of the higher ranking members in the Roanoke zone. As to J Black's drug dealing, Johnson testified that "[h]e was, as you would say, in the shadows. He was involved in drug dealing; but in my perspective, he didn't really do a lot for the gang." Id. at 42.[8] Johnson testified that the gang engaged in drug trafficking in several Virginia state prisons, including Buckingham Correctional Center located in the Western District of Virginia. Id. at 62. After his release from Greensville in December 2012, Johnson went home to Winchester, Virginia, in the Western District of Virginia. Id. at 37. Boone, then housed at Keen Mountain Correctional Center, mailed Johnson a letter dated March 8, 2013, telling Johnson to read a coded message over a radio show listened to by inmates at Keen Mountain. Id. at 74–76. The purpose of the coded message was to send a hit on another inmate inside the prison for violating gang rules. Id. at 76. Johnson testified that he read the message, but skipped over the coded language. Id. at 77. Nevertheless, he was

---

[8] Each side argued to the jury about Bumbry/J Black's drug dealing for the gang in Roanoke, with defense counsel focusing on this testimony by Johnson discounting Bumbry/J Black's role. The court instructed the jury on venue in a conspiracy case, ECF No. 1049, at 41–42, and this issue was for the jury to decide. It was not ineffective for appellate counsel not to raise on appeal an issue squarely within the province of the jury as to which it was properly instructed.

arrested for his role in this crime in November 2013, after which he quit the gang. Id. at 57–58.

Virginia Department of Corrections intelligence officer William Howard testified that he began investigating the actions of the Mad Stone Blood gang at Keen Mountain beginning in 2012. Trial Tr., ECF No. 1125, at 190. Howard testified that his investigation revealed that Larry Boone was a member of the Mad Stone Bloods incarcerated at Keen Mountain and identified a number of gang related letters addressed to or from Boone at Keen Mountain. Id. at 218–22. The Keen Mountain Correctional Center is located in Oakwood, Virginia, in the Western District of Virginia.

Linda Leatherwood testified that she is employed as an intelligence specialist in the Operations and Logistics Unit of the Virginia Department of Corrections, investigating gangs, drugs, and terrorists. Id. at 231, 233–34. Leatherwood testified that she first became aware of Mad Stone Bloods gang activity in 2011 at the Buckingham Correctional Center. Trial Tr., ECF No. 1125, at 234. The Buckingham Correctional Center is located in Dillwyn, Virginia, in the Western District of Virginia. Leatherwood explained that Hasin Hubbert, the leader of the Mad Stone Bloods, Rontae Gunn and Clifford Jennings, Mad Stone Bloods members, were incarcerated at Buckingham. As did Howard, Leatherwood testified as to mail covers put on gang members' correspondence to flag them for investigation.

In addition, when instructing the jury on conspiracy, the court specifically instructed the jury on the issue of venue. The court instructed the jury that "[f]or you to return a guilty verdict, the government must convince you that some act in furtherance of the conspiracy charged took place here in the Western District of Virginia," Trial Tr., ECF No. 1049, at 41,

and read the jury the list of Virginia counties encompassing the Western District of Virginia. Id. at 41–42. The jury was required to find that some act in furtherance of the drug conspiracy charged in Count Two took place in this district.

Plainly, venue was proper in this district for the conspiracies alleged in Counts One and Two, and Brown's appellate counsel was not ineffective for not arguing on appeal that venue for the drug conspiracy was improper in this district.

## V.   Conclusion

For the reasons stated, the court will deny Brown's motion to vacate under 28 U.S.C. § 2255. As the trial and appellate record conclusively establishes that Brown's claims of ineffective assistance of counsel on appeal are groundless, there is no reason to convene an evidentiary hearing.   Additionally, because Brown has not made a substantial showing of the denial of a constitutional right as required by 28 U.S.C. § 2253(c), the court will deny a certificate of appealability. An appropriate order will be entered.

Entered: July 29, 2023

Michael F. Urbanski
Chief U.S. District Judge
2023.07.29 17:09:28
-04'00'

Michael F. Urbanski
Chief United States District Judge