CLERK'S OFFICE
U.S. DISTRICT COURT
AT ROANOKE, VA
FILED
February 14, 2025
LAURA A. AUSTIN, CLERK
BY: s/ S. Neily, Deputy Clerk

## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF VIRGINIA
## ROANOKE DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA | ) |
| | ) Criminal No. 7:16-CR-30026 |
| v. | ) |
| | ) |
| TERRANCE N. BROWN, JR., | ) By: Michael F. Urbanski, |
| | ) Senior United States District Judge |
| Defendant-Petitioner | ) |

### MEMORANDUM OPINION

This matter comes before the court on Terrance Nathaniel Brown Jr.'s motion for a sentence reduction filed pursuant to 18 U.S.C. § 3582(c)(1)(A). ECF No. 1405. The government responded in opposition and Brown has filed two replies. ECF Nos. 1420, 1423, 1424. As discussed more fully below, the court **DIMISSES** his motion as unexhausted and, alternatively, **DENIES** it on the merits.

### I. Background

On August 9, 2017, Brown and seven co-defendants were charged in a superseding indictment with crimes related to their involvement in a racketeering conspiracy involving murder, robbery, and drug distribution. Superseding Indictment, ECF No. 526. Brown was charged in six counts, including participating in a racketeering conspiracy in violation of 18 U.S.C. § 1962(d) (Count One); conspiring to distribute a detectable amount of heroin, cocaine base, powder cocaine, methamphetamine, marijuana, and Suboxone, in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(C) and 846 (Count Two); violent crime in aid of racketeering – assault with a dangerous weapon in violation of 18 U.S.C. §§ 1959(b)(3) and 2 (Count Three); use of a firearm during a crime of violence in violation of 18 U.S.C. § 924(c)(1)(A)(i) (Count

Five); violent crime in aid of racketeering, in violation of 18 U.S.C. § 1959(a)(3) and 2 (Count

Six); and use of a firearm during a crime of violence in violation of 18 U.S.C. § 924(c)(1)(A)(iii)

(Count Eight).

On October 9, 2017, following a jury trial, Brown was found guilty on Count Two,

conspiracy to distribute and possess with intent to distribute heroin, cocaine, cocaine base,

and marijuana. Verdict Form, ECF No. 893.[1] On May 1, 2018, the court sentenced Brown to

240 months, to be followed by a 5-year term of supervised release. J., ECF No. 1154.[2] Brown

filed a direct appeal and his conviction was affirmed. United States v. Brown, 811 F. App'x

818 (4th Cir. 2020), cert. denied, 141 S.Ct. 2571 (2021). Brown also moved to vacate his

sentence pursuant to 28 U.S.C. § 2255. ECF No. 1378. This court denied his motion on July

31, 2023, ECF Nos. 1407, 1408, and the Fourth Circuit Court of Appeals affirmed the denial

on May 23, 2024. United States v. Brown, No. 23-6789, 2024 WL 2362354 (4th Cir. May 23,

2024), cert. denied, No. 24-5117, 2024 WL 4427360 (2024). Brown currently is housed at

Federal Correctional Institution Three Rivers and has a projected release date of April 21,

2035.[3]

---

[1] In the Presentence Investigation Report (PSR), it was stated that Brown was charged under § 841(b)(1)(A). PSR, ECF No. 129 at p. 1 and ¶ 192. However, it appears that two co-defendants, Michael Jones and Clifford Alexander Jennings, were charged under § 841(b)(1)(A) and Brown was charged under § 841(b)(1)(C). See Gov't's Sentencing Memorandum, ECF No. 1116 at 1 (stating that Brown's offense carried a maximum penalty of 20 years in prison); Tr. of Sent. Hrg., ECF No. 1242 at 18 (confirming with probation officer that Brown was charged under § 841(b)(1)(C)) and J., ECF No. 1154 (finding Brown guilty of § 841(b)(1)(C)).

[2] Counts Three, Five, Six, and Eight were dismissed on motion of the government. Count One was transferred to the Eastern District of Virginia after it was determined that venue was proper in that district. J., ECF No. 1154; Mem. Op. and Order, ECF Nos. 929, 930. Following a jury trial, Brown was found guilty in the Eastern District of Virginia of one count of distribution of less than 50 kilograms of marijuana and one count of distribution of Clonazepam. He was sentenced to a term of 36 months to run consecutively to the 240-month term of imprisonment assessed by this court. ECF No. 509 in United States v. Brown, No. 2:17CR00150 (E.D. Va. Nov. 16, 2019).

[3] https://www.bop.gov/inmateloc/ (search "Terrance Brown") (last viewed Dec. 3, 2024).

Brown seeks compassionate release based on the fact that he was assaulted in his cell in September 2022 and continues to suffer from the attack both mentally and physically. He also complains about a pending state detainer and states that he needs to be with his family. The government counters that Brown has not shown an extraordinary and compelling reason warranting compassionate release, and even if he had, the 18 U.S.C. § 3553(a) factors preclude relief.

## II. Compassionate Release

The compassionate release statute, 18 U.S.C. § 3582(c)(1)(A), as amended by the First Step Act, authorizes courts to modify terms of imprisonment as follows:

> The court may not modify a term of imprisonment once it has been imposed except that—in any case—the court, upon motion of the Director of the Bureau of Prisons, or upon motion of the defendant after the defendant has fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier, may reduce the term of imprisonment (and may impose a term of probation or supervised release with or without conditions that does not exceed the unserved portion of the original term of imprisonment), after considering the factors set forth in section 3553(a) to the extent that they are applicable, if it finds that—
>
> (i) extraordinary and compelling reasons warrant such a reduction . . . and that such a reduction is consistent with applicable policy statements issued by the Sentencing Commission.

Accordingly, Brown's requested relief requires the court to consider (1) if he exhausted his administrative remedies; (2) if so, whether there are extraordinary and compelling reasons that warrant a reduction in his sentence; and (3) if so, what, if any, sentence reduction is appropriate after considering the applicable 18 U.S.C. § 3553(a) factors.

### A. Exhaustion

The court begins by considering the threshold requirement for obtaining relief under § 3582(c)(1)(A). United States v. Muhammad, 16 F. 4th 126, 129–30 (4th Cir. 2021). This requirement, which is non-jurisdictional, is "satisfied if a defendant requests the Bureau of Prisons to bring a motion [for compassionate release] on their behalf and either fully exhausts all administrative rights to appeal the Bureau's decision or waits 30 days from the date of their initial request to file a motion in the district court." Id. at 131. The government asserts that Brown did not file a request with the warden of his facility to bring a motion for compassionate release on his behalf and urges the court to deny Brown's motion on this basis. Resp., ECF No. 1420 at 5. Brown responds that defendants are no longer required to exhaust their administrative remedies, Reply, ECF No. 1423 at 1, and also argues that he did ask the warden of his facility to file a motion for compassionate release on his behalf and then waited more than 30 days before filing his pending motion. Second Reply, ECF No. 1424 at 1–2. Brown submitted no evidence to support his claim that he filed a request with the warden.

While the exhaustion requirement is a non-jurisdictional claim-processing rule and can be waived by the government, Muhammad, 16 F.4th at 129–130, when the government raises exhaustion as a defense, the district court must address the issue. United States v. Spencer, No. 20-7171, 2022 WL 355775 (4th Cir. 2022) (per curiam). See also Rice v. Rivera, 617 F.3d 802, 810 (4th Cir. 2010) ("Claim-processing rules, by contrast, are to be rigidly applied when invoked by a litigant, but can be forfeited if not raised and pursued in a timely fashion.") Once the government raises the issue, the burden is on the defendant to show either that he has

4

exhausted his remedies or that 30 days have passed since he made his request. United States v. Poole, No. 3:01-CR-00193-GCM, 2024 WL 4271587 at *1 (W.D.N.C. Sept. 23, 2024).

In this case, Brown claims to have exhausted his administrative remedies but has provided no evidence that he has done so. Because the court must "rigidly apply" the exhaustion requirement and Brown presented no evidence of exhaustion, the court now finds that Brown did not exhaust his administrative remedies and his motion is **DISMISSED** for that reason. See United States v. Holloway, No. DKC 13-0525-2, 2020 WL 5407812 (D. Md. Sept. 9, 2020) (denying without prejudice motion for compassionate release as unexhausted where defendant did not include evidence of exhaustion with motion). In the alternative and as discussed below, the court also **DENIES** Brown's motion on the merits.

### B. Merits

The court next must consider whether it should reduce the term of imprisonment. Effective November 1, 2023, the United States Sentencing Commission amended the policy statement that addresses motions for sentence reduction under 18 U.S.C. § 3582(c)(1)(A) when a defendant alleges that extraordinary and compelling reasons warrant a reduction. See U.S. SENT'G COMM'N, GUIDELINES MANUAL § 1B1.13 (Nov. 2023) (USSG or guidelines). The revised policy statement will be applied to Brown's motion.

Brown's motion for compassionate release is predicated on events that occurred at United States Penitentiary Hazelton on September 29, 2022. The unit was on lockdown, and Brown was returned to his cell by two officers following a trip to the shower. He was placed in his cell and as soon as the door was closed, his cellmate attacked him with a homemade "shank." Brown tried to back up toward the door so that the officers could remove his

handcuffs to allow him to defend himself, but the officers walked away. Mot., ECF No. 1405. Brown alleges that at one point during the incident, "the whole administration" was in front of his cell watching the attack and made no effort to help him. Id. at 2.

After the attack, Brown was transported to an emergency department outside the prison. He was diagnosed with a traumatic pneumothorax;[4] acute posthemorrhagic anemia; lacerations without foreign body on unspecified front wall of thorax without penetration into thoracic cavity; maxillary sinus fracture, right side; multiple lacerations without foreign body on an unspecified part of his neck; right elbow; left cheek and temporomandibular area; right ear; oral cavity; posterior back, and other part of head. Med. R., ECF No. 1414 at 3, 8.[5]

A tube was placed in the left side of his chest to treat the pneumothorax and he was administered one unit of whole blood. Id. at 29–30, 100–200. The pneumothorax resolved and the chest tube was removed on October 1, 2022. Id. at 79–80. The lacerations were 1 to 3 cm in length and of varying depths. There was a 2 cm laceration to his left cheek along his beard line, a 2 cm laceration below his right eye, three lacerations to his right cheek along his beard line with two of those being 1 cm in length and one of those being 2 cm in length that was through and extending into the oral cavity. He had lacerations to his left ear and nose and eight to ten lacerations of 1 to 3 cm to the dorsum of his neck. Id. at 91.

---

[4] Traumatic pneumothorax occurs when air accumulates between the chest wall and the lung because of an injury. It causes the lung to collapse partially or completely. Traumatic pneumothorax is treated by removing the air from the pleural space and allowing the lung to reinflate. Usually, a tube is inserted into the chest between two ribs and attached to a suction device to remove the air and allow the lung to reinflate. The procedure can be done using only a local anesthetic. https://www.merckmanuals.com/home/injuries-and-poisoning/chest-injuries/traumatic-pneumothorax

[5] The medical records from Brown's admission to the outside hospital were submitted on a computer disk and filed under seal at ECF No. 1414. As a result, the records do not bear the typical numbered heading that is printed on the top of documents that are filed via the CM/ECF electronic filing system. The court identifies these records by the page number printed on the bottom right corner of each page.

The lacerations were sutured at bedside after the areas were numbed with lidocaine. Id. at 99–101. Brown was advised to apply Bacitracin to the lacerations for three days and then to continue with Vaseline. He was given other self-care follow-up instructions and it was recommended he use over-the-counter medications for pain and discomfort associated with his nasal injuries. He also was advised to follow up with the oral surgery clinic in 7 to 10 days for suture removal and concern for dental fractures. Id. at 100. A physical therapy evaluation found that Brown was limited by pain, but was able to complete bed mobility, transfers, and ambulation without an assistive device and with standby assistance. It was anticipated that he would be safe to return to his facility when he was medically stable for discharge. Id. at 379. An occupational therapist opined that pending pain control and increased activity, Brown would be safe to return to his facility once it was medically appropriate. Id. at 378.

On October 2, 2022, five days after being admitted, Brown was discharged from the hospital with instructions to take acetaminophen-codeine, bacitracin, cephalexin, gabapentin, magnesium hydroxide, melatonin, methocarbamol, polyethylene glycol, iron-folate, and sennosides-docusate sodium. Id. at 401–02. He was instructed to obtain a chest X-ray prior to his trauma follow-up appointment. Id. at 407. He was advised that if he was unable to return for follow-up that the sutures and staples needed to be removed within seven to ten days by a healthcare provider. Id. at 419.

Brown contends that the follow-up care he received in the Bureau of Prisons (BOP) after he was released from the hospital was so lacking that it qualifies as an "extraordinary and compelling" reason for a sentence reduction. The policy statement in the revised guidelines now provides in USSG § 1B1.13(b) that an "extraordinary and compelling" reason warranting

7

compassionate release can exist under any of the following circumstances, each of which
includes detailed requirements and caveats:

    (1) Medical Circumstances of the Defendant.

    (2) Age of the Defendant.

    (3) Family Circumstances of the Defendant.

    (4) Victim of Abuse.

    (5) Other reasons.

    (6) Unusually Long Sentence.

The court will examine Brown's claims under the subsections "Medical Circumstances of the
Defendant" and "Victim of Abuse."

**(1) Medical Circumstances**

    To qualify for a sentence reduction based on medical circumstances, a defendant must
show one of the following:

        (A) that he is suffering from a terminal illness with an end-of-life
        trajectory;

        (B) that he is suffering from a serious functional or cognitive
        impairment or is experiencing deteriorating physical or mental
        health because of the aging process that substantially diminishes
        his ability to provide self-care within the facility;

        (C) that he is suffering from a medical condition that requires
        long-term or specialized medical care that is not being provided
        and without which he is at risk of serious deterioration in health
        or death;

        (D) the defendant is housed at a correctional facility affected or
        at imminent risk of being affected by an ongoing outbreak of
        infectious disease or an ongoing public health emergency
        declared by the appropriate federal, state, or local authority and
        that due to personal health risk factors, the defendant is at

increased risk of suffering severe medical complications or death as a result of exposure to the disease or health emergency and such risk cannot be adequately mitigated in a timely manner.

USSG § 1B1.13(b)(1).

Brown has not alleged facts to support a finding that any subsection of § 1B1.13(b)(1) applies to him. He does not allege that he is suffering from a terminal illness or that he is suffering from a serious functional or cognitive impairment or experiencing deteriorating physical or mental health because of the aging process. USSG §§ 1B1.13(b)(1)(A) and (B). Nor is he complaining about an outbreak of an infectious disease at his prison facility. USSG §§ 1B1.13(b)(1)(D).

To the extent that Brown is asserting that subsection (C) applies to him, he has made no showing that he is suffering from a medical condition that requires long-term or specialized care that he is not receiving, and without which he is at risk of serious deterioration in his health or death. Brown complains that he continues to suffer from pain and post-traumatic stress disorder (PTSD) since the attack and that he has not received adequate follow-up care from BOP medical staff since being released from the hospital following the assault. Mot., ECF No. 1405 at 2. He alleges that he has not been scheduled to see a neurologist despite having so much pain that it is difficult to move around. He is always dizzy and has burning nerve pain on the right side of his face, head, neck, shoulder, and back. Id. In addition, Brown asserts that he was supposed to be scheduled to see an outside dentist because his mouth was punctured in several places, but no appointment was scheduled. The injuries to his mouth cause him pain when he eats. Reply, ECF No. 1423 at 2. He claims that he receives nothing to help with pain other than Elavil which is prescribed to help him sleep but does not help.

Id. He is extremely anxious and fearful and has made multiple requests for mental health treatment, but no treatment has been provided. Id. at 3. He also complains that a nurse removed his stitches which was very painful because the nurse was inexperienced and did not know what she was doing. Id. He complains that his mouth is sore and he cannot eat anything without pain and discomfort. Id. Brown asserts that although the medical records show that doctors have signed many of the records, he has not been seen by a physician. Id.

However, the medical records related to the care Brown received upon returning to BOP custody do not support Brown's allegations. To the contrary, the records, as summarized below, indicate the opposite—that Brown is being provided adequate care and is not at risk of serious deterioration in health or death.

On October 2, 2022, the day Brown was discharged from the hospital, he was assessed by a nurse practitioner (NP) upon his return to the BOP. The NP noted the recommendation that Brown follow up with staple removal in one week and complete a chest X-ray by October 23, 2022. Med. R., ECF No. 1470-3 at 23. On examination, Brown was ambulatory with a steady gait, oriented as to persons, places, and things, his breathing was even and unlabored, he was in no acute distress, and he had multiple sutures and staple sites. Id. at 24. He was prescribed Acetaminophen/Codeine, Gabapentin, Polyethylene Glycol Powder, Cephalexin, Neomycin, and Magnesium Hydroxide and told to follow up at sick call as needed. Id. at 25.

A chest X-ray on October 6, 2022, was clear with no sign of pleural effusions or pneumothorax. Med. R., ECF No. 1470-5 at 58. On October 10, 2022, Brown requested a dental visit because of mouth pain related to the stabbing. Med. R., ECF No. 1420-5 at 329.

On October 11, 2022, Brown's staples and sutures were removed by a nurse. Med. R., ECF No. 1470-5 at 141.

On October 20, 2022, Brown was assessed by a physician's assistant (PA) through his cell door in the Special Housing Unit. He complained of dizziness when lying, sitting, and standing. When he was walking, he felt like he tilted to one side. The PA noted that his wounds were healing but Brown thought he had a suture remaining in his right cheek. Lying on his right ear caused pain. He reported a constant severe headache in his forehead and bilateral temporal area and was sensitive to light. He said he had intermittent episodes of "breathing fast," but his respirations were normal during the exam. Med. R., ECF No. 1470-3 at 17.

The exam was incomplete because Brown was seen through the cell door, but the PA noted that when called, Brown jumped down from the side of the top bunk, his gait was steady, and he walked unassisted to the cell door. Id. The PA requested a neurology consultation with a target date of November 25, 2022. Id. at 20. The suture seen on October 20, 2022, was removed on October 25, 2022. Med. R., ECF No. 1470-5 at 141. On November 3, 2022, Brown was seen by a dentist for a broken tooth and the tooth was extracted. ECF No. 1470-3 at 72–73.

Brown saw a psychologist on December 6, 2022, and reported an increase in anxiety and hypervigilance and that he was experiencing night terrors. His mental status exam was unremarkable except for his appearing anxious. He was diagnosed with PTSD. Med. R., ECF No. 1420-5 at 223–24. On December 8, 2022, Brown was seen at his cell by a PA. He reported symptoms of anxiety and depression, sleep difficulties, nightmares, headaches, dizziness, and

right-side facial tingling. His gait was normal. His neurology consult was still pending. Med. R., ECF No. 1470-3 at 7. Paxil was prescribed for his PTSD. Id.

On December 28, 2022, Brown reported that the Paxil caused him to shake and made his anxiety worse. He continued to complain of intermittent dizziness and headaches, and numbness in his right cheek and jaw. The Paxil was discontinued and he was prescribed Effexor for PTSD and neuropathic pain. His neurology consultation was still pending. Id. at 3–5. On January 12, 2023, Brown complained of dizziness that interfered with his sleep, numbness in his right cheek and jaw, and "jumping" in his right cheek. Med. R., ECF No. 1420-5 at 101.

On February 9, 2023, Brown saw a psychologist. He had completed a workbook about coping skills for trauma and was receptive to using grounding and breathing techniques for his anxiety. His mental status exam was unremarkable. Id. at 215. The same day, Brown was seen by a PA and reported that the Effexor made him feel more anxious so it was discontinued and he was started on Zoloft. He continued to complain of dizziness and facial numbness and pain. Id. at 96.

On March 6, 2023, it was noted that Brown was engaged in a hunger strike to protest his placement in the Special Housing Unit (SHU). His reported goal was to obtain medical treatment and to be allowed to talk to the Central Office to voice his grievances about being in the SHU. He also wanted to be transferred to a different facility. He denied any immediate mental health concerns, other than continuing to experience nightmares, hyper vigilance, and an exaggerated startle response following the attack by his cellmate. Id. at 214. He continued with his hunger strike until March 14, 2023. Id. at 211–212; 46–81.

On March 30, 2023, Brown reported that his right-side facial pain was slightly improved on Elavil but he still had numbness. He said the Zoloft upset his stomach. He was exercising more and reported intermittent increase of headache with exercise. Id. at 36. On March 31, 2023, Brown saw a psychologist and reported nightmares and difficulty related to the 2022 assault. He identified reading, working out, and talking to mental health professionals as coping skills. His mental status exam was unremarkable. Med. R., ECF No. 1420-5 at 209.

On April 13, 2023, Brown reported continued flashbacks and nightmares and had pain and numbness on the right side of his face and scalp. He still experienced intermittent dizziness and headaches upon exertion. He complained about the side effects of Zoloft and Effexor and agreed to start Prazosin. Id. at 27. On May 1, 2023, Brown said that he still suffered from symptoms of PTSD, which was treated with Elavil and Prazosin. He had been transferred out of the SHU and reported symptoms of anxiety at being around other inmates. Id. at 205.

On May 24, 2023, Brown reported being so dizzy that he could not stand up. Id. at 14. On June 30, 2023, Brown complained of pain in multiple locations and dizzy spells. Id. at 11. On July 7, 2023, Brown said his nerve pain was "10/10" but he was described as smiling and talking during the encounter with the NP. He asked for an increase in his medication and the Elavil dose was increased from 50 mg to 75 mg. He also asked for ankle braces but did not have a diagnosis warranting the braces. He was told to lace up his high-top boots to support his ankles. Id. at 8.

On August 25, 2023, Brown said that he was playing basketball and both his ankles felt weak. He asked for ankle braces, which he said had been ordered for him in 2020. He was told to refrain from sports and other strenuous activity related to his weak ankles to prevent further

injury. Id. at 2–3. On August 30, 2023, X-rays of Brown's ankles were described as "normal,"
with normal bone mineralization, no acute fracture, dislocation, or malalignment, and no
osteochondral fracture or defect. The ankle mortise joint space was maintained. Id. at 266.

On February 23, 2024, Brown complained of bilateral knee pain and said that he had
nerve pain scattered all over his body. It was noted that he walked with no distress. Brown
was given an injection of Ketorolac. Med. R., ECF No. 1470-4 at 87–89.

On March 19, 2024, Brown reported that he fell while walking around in his cell causing
bruising to his face, and the bruising was noted by the nurse who examined him. He said he
had dizzy spells when he would get up to walk around his cell to relieve his knee pain. He was
prescribed Ibuprofen. Id. at 81–82. On April 1, 2024, an X-ray of Brown's facial bones showed
no acute displaced facial bone fracture or osseous deformity. There were healed fractures of
the lower left mandible body and right parasymphyseal mandible body and fixation plates and
screws without loosening or failure. Id. at 212.

On April 9, 2024, Brown saw a psychologist who observed that he was alert, oriented,
and cooperative and reported a euthymic mood with congruent affect. He showed no
symptoms of anxiety, depression, mania/hypomania, or psychosis. Brown reported severe
nerve pain and insomnia because of face twitching and knee pain. He said that he had not
been seen by medical staff since the stabbing. He also said he was anxious, hypervigilant,
distrustful of others around him, and easily irritated. At the end of the session, Brown said
that he did not want to receive further psychological services. Med. R., ECF No. 1470-5 at 9.

Nevertheless, on April 19, 2024, Brown had another visit with a different psychologist
in response to a request he made. He reported anxiety attacks, always being on edge, and

difficulty sleeping. He had muscle spasms on a regular basis. He was observed to have an anxious affect. Id. at 8. At a subsequent visit with the psychologist, Brown reported "feeling betrayed" in his legal case which had led to self-imposed isolation. He had problems trusting people. Muscle spasms and nerve damage made it difficult for him to exercise as often as he would like. He identified exercise as a stress reliever. Id. at 7. Brown had another appointment with the psychologist set for June 27, 2024, but did not arrive for the appointment. Id. at 6.

On April 15, 2024, Brown was seen in the chronic care clinic for ongoing complaints of pain related to the 2022 attack. He was taking Elavil for "nerve pain" but did not like it because it made him sleepy. He denied having any mental health issues. The Elavil was discontinued and he was prescribed Naproxen. Id. at Med. R., ECF No. 1470-4 at 76–80.

On April 18, 2024, Brown was seen by a dentist after complaining of occasional pain and swelling around his lower jaw. An X-ray showed no abnormality other than a previous jaw fracture. Id. at 150.

On May 16, 2024, Brown saw an NP and said he was always anxious and unable to rest and described himself as paranoid. He denied ever having been prescribed medication for his mood. The NP prescribed BuSpar. Id. at 67–69.

Brown saw a neurologist from outside the prison on June 21, 2024. He reported that since the attack in 2022, he had "trouble with his nerves" and had difficulty with exercising. He had pain from his feet to his head that was always present but fluctuated in intensity. Standing up after sitting for a time exacerbated his pain and when he was walking or standing his legs tended to give out on him. His examination was within normal limits except for slightly reduced reflexes. The doctor diagnosed Brown with generalized weakness, muscle weakness,

numbness and tingling, and chronic pain syndrome. He ordered blood work and electromyography and nerve conduction velocity tests. Brown was to return for follow up in three months. Id. at 199–203.

Brown was transferred to FCI Three Rivers in August 2024 and it was noted that he needed a follow-up visit with a neurologist. Id. at 186–88. On August 8, 2024, Brown was screened for an autoimmune disorder and the test was negative. Id. at 160. On September 11, 2024, as part of a routine health screen, Brown reported no new health issues. At that time, he was prescribed BuSpar 5 mg., and Naproxen 500 mg. Med. R., ECF No. 1470-4 at 97–101.

On September 25, 2024, Brown described his anxiety and depression as stable and asymptomatic. His leg pain had improved and he experienced only occasional discomfort. He had no restrictions and no treatment was recommended. Id. at 44–47.

On October 10, 2024, Brown complained of pain in his neck, back, and knees, but mostly in his knees. He was prescribed steroids and Cymbalta. Id. at 35–39. On October 22, 2024, Brown said he was more tired than usual and not getting pain relief from Cymbalta. Id. at 29–31. On October 25, 2024, Brown reported that Cymbalta was not controlling his pain, caused him to feel lethargic, and upset his stomach. He walked with a normal gait and had full range of motion in his neck and extremities. The NP requested a prescription of Gabapentin, but it was not approved. Id. at 22, 24–28.

In November 2024, as part of a psychological screening, Brown reported having received psychological services after the 2022 stabbing and said he was prescribed BuSpar but took the medication only one time. His mental status exam was unremarkable. He denied

current mental health concerns and declined the need for further mental health services. Med. R., ECF No. 1470-5 at 4.

On December 3, 2024, Brown reported worsening pain in his knees related to nerve damage and said he thought he needed to have them drained. He reported difficulty walking, impaired range of motion, and decreased endurance. The nurse noted decreased range of motion, clicking or popping with flexion, tenderness to touch, and mild edema. Med. R., ECF No. 1470-4 at 7–10. On December 5, 2024, X-rays of Brown's knees showed normal bone mineralization, no acute fracture, dislocation, or malalignment, and the joint spaces were maintained. Small bilateral quadriceps tendon enthesophytes were seen. Id. at 179.

On December 12, 2024, Brown said he had pain that moved all over his body. He was upset that his request for Gabapentin was denied because he said his other medication did not help with his pain. Med. R., ECF No. 1470-4 at 2–6.

The record in this case shows that Brown is receiving ongoing medical care and that he is not at risk of serious deterioration in his health or death. He has had numerous appointments to address his anxiety, pain, and dizziness and multiple modalities have been prescribed to address his complaints, with some of them providing symptom relief. Brown lives with chronic pain and intermittent dizziness, but he can exercise and he plays basketball on occasion. His anxiety appears to wax and wane, as sometimes he welcomes visits to a therapist and medication and other times claims that he does not need treatment.

While the BOP medical staff has not found treatment that completely relieves his pain, dizziness, and anxiety, the record does not support a finding that the incomplete symptom relief is caused by lack of specialized medical care. Rather, it appears that his symptoms are

not entirely responsive to the various medications that have been prescribed, and in some instances, Brown has decided that the side effects of prescribed medications outweigh their benefit. And while it is true that the BOP delayed for more than a year in scheduling a neurology appointment for Brown, and the record does not indicate that the recommended electromyography and nerve conduction velocity tests have been performed, given Brown's high level of functioning, it does not appear that the lack of follow-up care has caused a serious deterioration in his health or put him at risk of death.

Cases where courts have granted compassionate release involve more serious medical conditions than those described by Brown and in those cases, the plaintiffs have provided evidence that the lack of timely care raises the risk of serious illness or death. See, e.g., United States v. Blackman, No. 1:13-CR-00268-1, 2023 WL 6536972 at *5 (N.D. Ill. Oct. 6, 2023) (granting compassionate release where defendant had very rare form of cancer and BOP responded in an inadequate and delayed manner in diagnosing and providing treatment for the condition); United States v. Dimmer, Nos. 3:12-cr-00035-TMB-1 and 3:12-cr-00056-TMB-7, 2023 WL 1766294 (D. Alaska, Feb. 3, 2023) (granting compassionate release where BOP delayed diagnosis and treatment of colon cancer and could provide no guarantee of timely treatment in the future); and United States v. English, No. 2:19-CR-20164, 2022 WL 17853361 (E.D. Mich. Dec. 22, 2022) (granting compassionate release where BOP mismanaged and delayed access to timely treatment for inmate with multiple tumors in his lower back and chest and on a bone behind his eye which put him at risk of sensory loss, blindness, stroke, altered mental state, and death).

The concerns raised in those cases are not present here. Brown has neither described nor provided evidence that any shortcomings in the care provided by the BOP have increased his risk of serious injury or death. The attack on Brown was undoubtedly terrifying, painful, and traumatic and he continues to experience residual symptoms. However, neither the symptoms nor any diagnosis he has received rises to the level of severity contemplated by USSG § 1B1.13(b)(1)(C). Accordingly, because Brown has not shown an extraordinary and compelling reason for a sentence reduction, his motion for compassionate release based on his medical condition is **DENIED**.

**(2) Victim of Abuse**

Another way for an inmate to show an extraordinary and compelling reason for a sentence reduction is by showing he has been a victim of abuse. The program statement sets out the following criteria:

> (4) Victim of Abuse.--The defendant, while in custody serving the term of imprisonment sought to be reduced, was a victim of:
>
> …
>
> (B) physical abuse resulting in "serious bodily injury," as defined in the Commentary to § 1B1.1 (Application Instructions);
>
> that was committed by, or at the direction of, a correctional officer, an employee or contractor of the Bureau of Prisons, or any other individual who had custody or control over the defendant.
>
> For purposes of this provision, the misconduct must be established by a conviction in a criminal case, a finding or admission of liability in a civil case, or a finding in an administrative proceeding, unless such proceedings are unduly delayed or the defendant is in imminent danger.

USSG § 1B1.13(4).

"Serious bodily injury" is defined as follows:

> an injury involving extreme physical pain or the protracted impairment of a function of a bodily member, organ, or mental faculty; or requiring medical intervention such as surgery, hospitalization, or physical rehabilitation. In addition, "serious bodily injury" is deemed to have occurred if the offense involved conduct constituting criminal sexual abuse under 18 U.S.C. § 2241 or § 2242 or any similar offense under state law.

USSG § 1B1.1, comment. (n. 1(M)). It appears that Brown suffered extreme physical pain during the attack and in the days after. Accordingly, the court finds that he suffered serious bodily injury for purposes of USSG § 1B1.13(4).

However, in addition to showing "serious bodily injury," a defendant seeking a sentence reduction based on his status as a victim of abuse must show that the abuse was committed by, or at the direction of a correctional officer, employee, or contractor of the BOP or another individual who had custody or control over him. Additionally, the misconduct must be established by a conviction in a criminal case, a finding or admission in a civil case, or a finding in an administrative proceeding.

Brown filed an administrative claim based on the assault by his cellmate. On July 19, 2023, Brown entered into a settlement agreement with the United States. Stipulation, ECF No. 1470-2. As part of the settlement, the parties agreed that the stipulation of compromise settlement was not and in no way was intended to be or should be construed as an admission of liability or fault on the part of the United States, its agents, servants, or employees and those parties specifically denied liability. Id. ¶ 4. The compromise settlement agreement forecloses relief to Brown under USSG § 1B1.13(4) because he cannot show that the assault was committed by, or at the direction of, a correctional officer, an employee or contractor of the

20

BOP, or any other individual who had custody or control over him as there has been no such finding or admission of liability in a civil case or administrative proceeding. Without such a finding, Brown cannot show that he was a victim of abuse as contemplated by USSG § 1B1.13(4). Accordingly, his motion for compassionate release based on the attack by his cellmate **DENIED**.[6]

Because Brown's case is **DISMISSED** as unexhausted and alternatively, **DENIED** on the merits, the court will not address the § 3553(a) factors. See United States v. Bethea, 54 F.4th 826, 833 (4th Cir. 2022) (describing the "extraordinary and compelling" reasons for relief as a threshold for eligibility); United States v. Elias, 984 F.3d 516, 519 (6th Cir. 2021) ("[D]istrict courts may deny compassionate release motions when any of the three prerequisites listed in § 3582(c)(1)(A) is lacking and do not need to address the others.")

### III. Conclusion

For the reasons stated herein, the court **DISMISSES** Brown's motion for a sentence reduction, ECF No. 1405, as unexhausted and, alternatively, **DENIES** the motion on the merits.

An appropriate order will be issued.

It is so **ORDERED**.

Entered: 02-13-2025

Michael F. Urbanski
Senior United States District Judge

---

[6] Additionally, Brown's complaints about a state detainer, ECF No. 1405 at 2–3, and his desire to be with his family, id. at 3, do not present "extraordinary and compelling" reasons for a sentence reduction.